IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| AZ DNR, LLC, d/b/a ERC, LLC,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | Case No. 13-2599-JWL |
| ) | |
| LUXURY TRAVEL BROKERS, INC.,  ) | |
| d/b/a FLYER MILES;  ) | |
| LUXURY TRAVEL BROKERS, INC.,  ) | |
| d/b/a FLYER SMILES; and  ) | |
| TIMOTHY W. GIBSON,  ) | |
| ) | |
| Defendants.  ) | |
| ) | |
| _____) | |

## MEMORANDUM AND ORDER

On October 24, 2014, the Court awarded plaintiff a default judgment on its claims, and on May 13 and 14, 2015, the Court conducted a hearing to determine plaintiff's damages and other relief pursuant to Fed. R. Civ. P. 55(b)(2).  This Memorandum and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a) with respect to plaintiff's damages.  For the reasons set forth below, the Court concludes that plaintiff has met its burden to show damages on its claim for breach of contract in the amount of $502,543.46, and judgment shall therefore be entered against defendants in favor of plaintiff in that amount.

As a preliminary matter, the Court notes that plaintiff's complaint includes a claim for injunctive relief against defendants, but at the hearing, plaintiff did not request

such relief or present any evidence in support of such a claim. Accordingly, the Court considers that claim to have been abandoned. Moreover, at the hearing plaintiff expressly limited its request for relief to its claim for breach of contract, and thus plaintiff's other claims are similarly deemed abandoned. Finally, although plaintiff also alleged in its complaint that defendants breached a contract with plaintiff by accessing accounts without notifying plaintiff and by taking more credit card points and frequent flier miles than authorized, plaintiff limited its claim at the hearing to damages resulting from defendants' breach by failing to pay for points and miles taken from plaintiff.

As noted in the Court's prior order by which it ordered the default judgment on liability, defendants are precluded at this stage from arguing the merits of their liability on plaintiff's claims. *See Olcott v. Delaware Flood Co.*, 327 F.3d 1115, 1125 & n.11 (10th Cir. 2003). By the default, defendants are deemed to have admitted plaintiff's well-pleaded allegations of fact. *See Jackson v. FIE Corp.*, 302 F.3d 515, 525 & n.29 (5th Cir. 2002) (citing 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2688 (3d ed. 1998)), *quoted in Olcott*, 327 F.3d at 1125; *United States v. Craighead*, 176 F. App'x 922, 924-25 (10th Cir. 2006). After the default judgment on liability, plaintiff bears the burden of proving its damages. *See Niemi v. Lasshofer*, 770 F.3d 1331, 1355 (10th Cir. 2014).

The Court thus begins by setting out the allegations of fact from plaintiff's amended complaint concerning its claim that defendants breached their contract with plaintiff by failing to pay for credit card points and frequent flier miles, which facts

2

defendants are deemed to have admitted.  Plaintiff and defendants are in the business of buying and selling access to credit card points and frequent flier miles.  *See* First Amended Complaint ¶¶ 8, 9.  The parties reached an agreement whereby defendants would self-serve points and miles from plaintiff's inventory in exchange for defendants' agreement to pay for all points and miles taken (among other agreements).  *See id.* ¶ 52. The parties' business transactions involved defendants' "purchase" of points and miles from plaintiff.  *See id.* ¶ 10.  Defendants breached the parties' agreement by failing to pay for points and miles taken from plaintiff.  *See id.* ¶ 54.  On June 6, 2013, the parties completed a reconciliation, and both sides agreed that defendants owed plaintiff $465,000 for points and miles "purchased" by defendants from plaintiff.  *See id.* ¶ 23. Defendants admitted that they owed plaintiff some amount; for example, after the June 6 reconciliation, the parties agreed that defendants "actually owed" plaintiff $465,000; in an e-mail of July 24, 2013, defendants' principal, Timothy Gibson, stated that defendants owed plaintiff approximately $170,000; Mr. Gibson did not follow through with later promises to pay certain amounts; and in an e-mail of August 9, 2013, Mr. Gibson admitted that defendants had not paid the entire $465,000 and that they had made an additional $148,000 in purchases of points and miles in June and July 2013.  *See id.* ¶ 31.

At the hearing, plaintiff offered testimony by Steve Browne, an expert accountant, who analyzed the parties' records of their transactions.  Mr. Browne concluded that plaintiff's accounting data and processes appeared reliable, and that defendants' data

contained errors and inconsistencies and were therefore unreliable. He also concluded that defendants had made purchases from plaintiff in the amount of $1,574,276; that defendants were also responsible for $27,015 for bad accounts sold to plaintiff; that defendants had made payments to plaintiff totaling $1,146,000; and that defendants therefore still owed $428,276. Finally, Mr. Browne added prejudgment interest to reach a grand total of $533,251 in damages through the date of the hearing.

Defendants did not offer any expert testimony, but they do dispute certain elements of plaintiff's damages calculation. First, defendants argue that plaintiff's total included $133,038 for bad accounts that defendants were unable to access. Second, defendants argue that plaintiff did not charge defendants any particular transfer price during the period prior to the June 6, 2013, reconciliation; that the parties anticipated splitting profits on sales of those points and miles to third parties; and that crediting defendants with a 40 percent profit on those points and miles would reduce plaintiff's damages by $38,010. Third, defendants argue that the expert's calculations included $347,844 in transactions that did not actually occur. In summing up these arguments, defendants note that these reductions would reduce plaintiff's damages to zero.

In determining the amount owed by defendants to plaintiff for purchases of miles and points, the Court begins by determining the amount already paid by defendants over the course of the parties' relationship. In an interrogatory answer, defendants identified that amount as $1,146,000, and plaintiff's expert used the same figure in his calculation. Thus, that figure is undisputed, and the Court finds that defendants have already paid

4

plaintiff a total of $1,146,000.

The Court next addresses defendants' argument that they are entitled to a split of profits for the period before the reconciliation of June 6, 2013.  It is undisputed that in early 2013 the parties had discussions about merging or entering into some formal arrangement to do business together, but as plaintiff points out, the parties did not execute any written agreement and the legal requirements for a merger of companies were not satisfied.  Defendants concede that no legal merger was effected, but they argue that the parties nonetheless operated as a joint venture during that period, with defendants selling points and miles purchased from others by plaintiff and with the parties dividing the profits (with credit for defendants' expenses).  As noted above, however, defendants are deemed to have admitted the factual allegations in the plaintiff's complaint, and plaintiff has clearly alleged that defendants *purchased* points and miles from it pursuant to the parties' agreement, including during the period prior to the reconciliation.  Defendants are precluded from arguing that the contractual terms were actually different or that no such contract existed as alleged by plaintiff; thus, defendants may not assert that the parties' agreement called for a profit split.

Defendants are also deemed to have admitted that they previously agreed and admitted that they owed plaintiff $465,000 at the time of the reconciliation on June 6, 2013.  Defendants now argue that that figure represented the gross receipts from sales on behalf of both parties, which amount was to be paid to plaintiff with the expectation that a share of profits would be returned to defendants.  Defendants submitted no

5

evidence, however, that plaintiff ever returned a share of profits to them, and it is simply not credible to suggest that, if the parties had agreed to a profit split at the reconciliation, the parties would not have figured that split into the amount owed by defendants, but instead would have agreed that defendants owed $465,000 with some undetermined amount due back from plaintiff at some future time.  Mr. Gibson failed in his testimony to provide any details about how a profit split was intended to be implemented.[1] Moreover, plaintiff submitted evidence, through its expert and through its principal, Russ Lindmark, that the agreed reconciliation amount of $465,000 was based on particular prices for each transaction involving the transfer of points or miles between plaintiff and defendants.   In his testimony, Mr. Gibson insisted that the $465,000 represented defendants' gross receipts, but he did not dispute that the agreed amount was based on an agreed price for each transaction.  Thus, the Court is persuaded by a preponderance of the evidence that defendants purchased points and miles for particular prices during the pre-reconciliation period.  In addition, plaintiff's allegation that defendants agreed and admitted that they owed plaintiff $465,000 at the time of the reconciliation, which fact is deemed admitted by defendants, does not include any conditions such as a future profit split or reimbursement of expenses.

Thus, the Court rejects defendants' argument that plaintiff's damage calculation

---

[1]Mr. Gibson's employee, Danilo Lommatzsch, testified to his understanding that the parties were going to split profits during this period, but he would not necessarily have had first-hand knowledge of the parties' agreement, as Mr. Lindmark testified that he and Mr. Gibson agreed to the price for each transaction between the parties.

should be adjusted to account for a split in profits during the pre-reconciliation period, and the Court finds that defendants instead made purchases from plaintiff during that period at particular prices, which prices plaintiff's expert used in accordance with the parties' agreement at the time of the reconciliation.[2]

The Court also rejects defendants' argument that certain transactions on which the expert relied did not actually occur.  Specifically, defendants take issue with Mr. Browne's opinion that they owe plaintiff a total of $347,844 for transactions that appeared in plaintiff's records but were absent from defendants' records (Mr. Browne's NM2 and NM3 categories of transactions).  The Court concludes, however, that Mr. Browne's opinion concerning the NM2 transactions is particularly credible because those transactions occurred before the June 6, 2013, reconciliation, in which the parties agreed that defendants owed money relating to those particular transactions.

Mr. Browne's NM3 category comprises 57 transactions that occurred after the reconciliation.  At the hearing, defendants' counsel cross-examined Mr. Browne about certain characteristics of some of those transactions that he had mentioned in his expert report (which was admitted into evidence).  For example, with respect to instances in

---

[2]Defendants do not appear to argue that they are entitled to a credit to account for an agreed separation fee, as they concede that they are prohibited from asserting an affirmative claim for relief.  Nonetheless, they appear to assert the existence of such an agreement in support of their profit-split argument.  In light of the Court's finding that the $465,000 reconciliation was based on particular transaction prices, the fact that no formal merger took place, and the lack of corroborating evidence that plaintiff actually agreed to pay such a fee, the Court rejects any argument by defendants based on an agreed separation fee.

which plaintiff no longer had access to the account, counsel asked Mr. Browne about deposition testimony by an employee of plaintiff about "provisioning" the accounts to defendants.[3] Mr. Browne testified, however, that he discussed those instances with that employee, and that he determined from his investigation and his analysis of available records that defendants actually used or purchased the points or miles in each of the 57 transactions within the NM3 category. Defendants did not offer any expert testimony at the hearing to rebut Mr. Browne's opinions, and defendants did not offer any evidence of their own to show that any one of these particular transactions did not take place. For instance, defendants did not attempt to attack any specific alleged transaction by demonstrating its absence from their own records and then offering some basis for concluding that the transaction likely did not occur. Defendants' counsel attempted in cross-examination to show that Mr. Browne did not examine certain bank records of defendants and did not take certain steps to attempt to corroborate his opinions, such as attempting to log into the actual customer accounts. Mr. Browne testified, however, that he could not have determined past account activity by logging into those accounts (which testimony defendants failed to rebut), and the Court finds credible Mr. Browne's testimony that he thoroughly analyzed each of the 57 transactions and that in his expert opinion defendants used or purchased the points or miles in each case. Mr. Browne also credibly testified that plaintiff's sales and accounting records were reliable, while

---

[3]In their own case, defendants did not seek to offer into evidence any excerpts from that deposition.

defendants' records (from which these transactions were absent) contained errors and inconsistencies and were thus unreliable.

Finally, the credibility of this argument by defendants is undermined by Mr. Browne's testimony that defendants initially agreed that some of these transactions had taken place, but that defendants then disputed these transactions for the first time immediately after receiving Mr. Browne's expert report. That credibility is further undermined by the fact that defendants presently dispute the existence of transactions that they previously discussed and agreed to in the reconciliation (those in the NM2 category). For these reasons, the Court concludes that plaintiff has met its burden to show that these transactions did occur, and they are properly included in the damages calculation.

Defendants also argue, based on testimony by Mr. Gibson, that plaintiff's damage calculation includes $133,038 for "bad accounts" that defendants eventually could not access. This argument does not bear on whether defendants purchased accounts from plaintiff, however; rather, defendants are effectively arguing that plaintiff breached some warranty or guarantee that defendants would always have access to purchased accounts, and such an affirmative claim for breach is precluded by the default judgment. Defendants also argue that if they could not use the accounts, then any purchase of those accounts failed for lack of consideration, but, again, defendants are prohibited at this

stage from pursuing such an attack going to the merits of whether a contract existed.[4] Moreover, even if defendants could assert such a defense, they failed to mitigate any harm by taking the simple step of asking plaintiff to resolve the access issues with plaintiff's customers—as plaintiff could easily do, according to Mr. Lindmark's testimony. Thus, the Court rejects this argument by defendants for an adjustment for bad accounts.

Defendants did not take issue with any other category of damages calculated by Mr. Browne. The Court concludes that Mr. Browne's credible testimony supported those damages, including by reference to defendants' own records. Accordingly, the Court accepts Mr. Browne's calculation, and it thus finds that defendant made purchases of points and miles from plaintiff totaling $1,574,276, and that plaintiff therefore suffered damages in the amount of $428,276.

According to Mr. Browne, plaintiff also suffered $27,015 in damages for "bad accounts." According to the expert report admitted into evidence, that figure represents "amounts paid by the Plaintiff to the Defendants for point balances that the Plaintiff is unable to utilize." The Court rejects such a claim. First, this claim for damages for bad accounts is not a claim for amounts that defendants failed to pay for purchases, and thus

_____

[4]Moreover, defendants received what they bargained for in those purchases—they received authorization to access accounts. There may have been a risk that their ability to access the account would change, which issue defendants would be free to attempt to remedy. But there is no basis to conclude that any such transaction failed for lack of consideration.

it does not fall within the scope of plaintiff's claims in this suit.  In alleging that defendants breached the parties' contract, plaintiff alleged that defendants failed to pay, used points and miles without notice, and took more points and miles than they were authorized to take; plaintiff did not allege that defendants breached any sort of warranty or guarantee of access with respect to accounts purchased by plaintiff from defendants. Thus, plaintiff has not sued on any such breach, nor has defendants' liability for such a breach been established.  Moreover, Mr. Lindmark conceded in his testimony that the parties did not reach any agreement that defendants would bear responsibility for such accounts.   Accordingly, the Court concludes that plaintiff is not entitled to these damages.

Plaintiff also seeks prejudgment interest on the damages found by the Court. "Prejudgment interest in Kansas is governed by K.S.A. § 16-201."  *See Hofer v. Unum Life Ins. Co. of Am.*, 441 F.3d 872, 878 (10th Cir. 2006) (quoting *Miller v. Botwin*, 258 Kan. 108, 119 (1995)).[5]  That statute provides for interest at a rate of ten percent per annum.  *See* K.S.A. § 16-201.  Prejudgment interest is permitted on liquidated claims, when the amount and date due are certain or definitely ascertainable by mathematical computation.  *See Hofer*, 441 F.3d at 880.  Whether to grant prejudgment interest falls

---

[5]Defendants have not disputed the application of Kansas law to plaintiff's claim for prejudgment interest, and in light of defendants' purchases from and payments to plaintiff in Kansas, the Court agrees that Kansas law governs plaintiff's contract claims. *See Turney v. Fifth Third Bank*, 2010 WL 1744670, at *3 (D. Kan. Apr. 29, 2010) (Lungstrum, J.) ("Under Kansas choice-of-law rules, . . . the law of the place of performance of the contract governs issues relating to performance.").

within the district court's discretion.  *See id.* at 879.

Defendants have not disputed plaintiff's entitlement to prejudgment interest in this case.  After defendants purchased points and miles from plaintiff and their payments for those purchases came due, plaintiff's claim for amounts due became liquidated.  Therefore, the Court concludes that an award of prejudgment interest is appropriate in this case.

As shown by his expert report, Mr. Browne calculated prejudgment interest in this case by applying Kansas's ten percent rate to the net balance due as of the date of defendants' last payment to plaintiff (although Mr. Browne ran that calculation on an amount due that improperly included the amount claimed for bad accounts).[6]  The Court concludes that such a method of calculation would be appropriately conservative in determining a date by which the damages were liquidated, as long as all of the purchase amounts had come due by that date.  Although the date of defendants' final payment does not appear to be in evidence, Mr. Browne's calculation reveals that he calculated interest back to August 26, 2013.  The Court thus infers from the available evidence that defendants had made their last payment to plaintiff by that date.

The evidence from Mr. Browne's report shows that defendants' last transaction

---

[6]Upon examination by the Court, Mr. Browne testified that he was not certain how he had calculated prejudgment interest, but he believed that he had done it on a transaction-by-transaction basis.  His expert report, however, indicates that he used the more conservative approach described above, and the Court finds that evidence to be more credible concerning the calculation that Mr. Browne performed.

with plaintiff, with one exception, occurred on July 25, 2013.  One of defendants'
interrogatory answers received into evidence establishes a three-week payment term.
Thus, except as applied to one transaction, plaintiff's use of a start date of August 26,
2013 is appropriate, and the Court will also use that date.  Interest from that date on the
outstanding balance of $428,276 to the date of this order (and the accompanying
judgment) would amount to $74,273.62.

The one exception, according to plaintiff's records as set forth in the expert
report, is a transaction occurring on September 12, 2013, in the amount of $555.  Using
the three-week payment term, the Court concludes that interest on that transaction should
run from October 3, 2013.  Thus, 38 days of interest on $555, amounting to $5.78, must
be deducted, leaving a total amount of $74,267.84 for prejudgment interest.  The Court
awards plaintiff that amount in prejudgment interest, which yields a total damage award
of $502,543.46.

At the hearing, plaintiff requested an award of attorney fees incurred since the
Court ordered the default judgment.  In recommending that the Court order the default,
the Magistrate Judge also recommended that each side bear its own costs and fees
incurred, and because plaintiff did not object to that recommendation, the Court so
ordered.  Plaintiff has not identified any basis for an award of fees incurred since the
default judgment order other than defendants' bad conduct during the litigation, and the
Court therefore presumes that plaintiff's request is made pursuant to Fed. R. Civ. P. 11.
Plaintiff argued at the hearing that defendants raised issues unnecessarily, but plaintiff

did not provide any detail to support that charge.

The Court concludes that plaintiff has failed to establish a violation of Rule 11 by defendants or their counsel since the Court's default judgment order. Defendants proceeded with new counsel after the events giving rise to the default, and those attorneys have represented defendants before this Court without issue. Although the Court has ultimately decided not to accept most of defendants' arguments concerning damages, plaintiff has not shown that any argument was frivolous. At the hearing, plaintiff's counsel expressed some unhappiness with the timeliness and completeness of defendants' discovery responses and productions, but as the Court noted at the hearing, plaintiff failed to bring any such issues before the Court in a timely fashion, and therefore there is no basis to find a violation based on defendants' conduct in discovery. In particular, the fact that plaintiff deposed Mr. Gibson with documents that defendants ultimately chose not to use at trial does not provide a basis for an award of attorney fees under Rule 11; indeed, discovery is designed and intended to encompass a broader universe of evidence than that ultimately used at trial. Accordingly, the Court denies plaintiff's request for an award of attorney fees.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiff is awarded damages on its claim for breach of contract in the amount of $502,543.46, and judgment shall therefore be entered against defendants in favor of plaintiff in that amount.

IT IS SO ORDERED.


Dated this 21st day of May, 2015, in Kansas City, Kansas.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge